UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

NOE ORTEGA PEREZ,                          Case No. 3:17-cv-00538-HDM-CLB

                          Petitioner,

        v.                                 ORDER

BAKER, WARDEN, et al.,

                          Respondents.

    This is a counseled petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, filed by a Nevada state prisoner.
The petitioner, Noe Ortega Perez, challenges his 2010 state court
conviction, following a jury trial, of six counts of lewdness with
a child under the age of 14 and two counts of sexual assault with
a minor under 14 years of age. (Pet. Ex. 33).[1] The first amended
petition comes before the court for consideration of the merits.
(ECF No. 17). Respondents have answered (ECF No. 28), and the
petitioner has filed a reply (ECF No. 37).

**I. Factual and Procedural Background**

    On April 17, 2009, the petitioner was charged by way of
indictment with eight counts of lewdness with a child under the
age of 14 and two counts of sexual assault with a minor under 14

---

[1] The exhibits cited in this order, comprising the relevant state court
record, are located at ECF Nos. 18-21, 23 and 29-30. The petitioner's
exhibits, located at ECF Nos. 18-21 and 23, are cited as Pet. Exs. The
respondents' exhibits, located at ECF Nos. 29-30, are cited as Resp.
Exs.

years of age, for acts that he engaged in with his 13-year-old niece-by-marriage, R.B., on September 13, 2008. (Pet. Exs. 3-10).[2]

On September 2, 2009, the State noticed the expert testimony of Dr. John Paglini. (Resp. Ex. 11). The notice stated that Dr. Paglini would "testify as to grooming techniques used upon children." (*Id.*) Attached to the notice was Dr. Paglini's curriculum vitae. (*Id.*) On October 12, 2009, defense counsel moved to exclude Dr. Paglini's testimony on the grounds that the notice was insufficient. (Pet. Ex. 15). The court denied the motion. (Pet. Ex. 14 (Tr. 23)).

At the trial, which commenced on October 15, 2009, the following relevant evidence was presented.

On September 12, 2008, the petitioner, his wife, Maria Perez, and their 13-year-old niece R.B., traveled by car to Las Vegas. (Pet. Ex. 19 (Tr. 66)). A week prior, the petitioner told Maria Perez that he had purchased three tickets for a concert in the city and that they should bring R.B. along. (Pet. Ex. 20 (Tr. 133)).

On the way to Las Vegas, the petitioner, Maria Perez, and R.B. stopped at a restaurant, where the petitioner played footsie with R.B. under the table. (Pet. Ex. 19 (Tr. 67)). After checking into the hotel room, they walked down Las Vegas Boulevard. As Maria Perez walked in the front, the petitioner and R.B. held hands. (*Id.* at 68-69). Maria Perez noticed during the walk that the petitioner was grabbing R.B.'s shoulder. (Pet. Ex. 20 (Tr. 131-32)). To R.B., Maria Perez appeared upset when she saw this. (Pet. Ex. 19 (Tr. 70)).

[2] One of the lewdness counts was later dropped. (Pet. Exs. 13, 16).

1    Later that night, back in the hotel room, the petitioner
2    kissed R.B. while Maria Perez was in the bathroom. (*Id.* at 71-77).
3    The next day while swimming at the hotel pool, the petitioner
4    flirtatiously touched R.B. under the water. (*Id.* at 78)). R.B.
5    told the petitioner that she was enjoying the trip and that she
6    wished she could be there alone with him. (*Id.* at 79). Around 2 or
7    3 p.m., they returned to the hotel room, where first R.B. and then
8    Maria Perez took a shower. (*Id.* at 80-81). While Maria Perez was
9    in the bathroom, the door slightly ajar, the petitioner began to
10   kiss R.B. (*Id.* 83-84). The petitioner paused to go into the
11   bathroom and check in on Maria Perez, and he closed the bathroom
12   door upon his return. (*Id.* at 84-85). The petitioner then knelt in
13   front of R.B., who was by then sitting on the corner of one of the
14   beds. (*Id.* at 85-86). They kissed again, then lay on the bed, where
15   the petitioner pulled down R.B.'s pants and panties. (*Id.* at 86-
16   87). The petitioner then touched and penetrated R.B.'s vagina with
17   his fingers and tongue and kissed her breasts. (*Id.* at 88-89).
18   R.B. testified that she did not want to kiss the petitioner
19   but did not tell him no and in fact kissed him back because she
20   had feelings for him and she wanted him to know that. (*Id.* at 134-
21   36). She testified that she told the petitioner she wanted to be
22   alone with him because of those feelings, but that she did not
23   expect him to do all the things he did. (*Id.* at 98-99, 137, 139).
24   She was surprised when he pulled her pants down, and she did not
25   want him to pull her pants down, but she did not scream because
26   she was afraid Maria Perez would be mad and did not stop the
27   petitioner because she was afraid of losing his trust. (*Id.* at
28   152, 166).

3

1    Maria Perez came out of the bathroom to retrieve a sponge,
2    saw R.B. and the petitioner together on the edge of the bed, and
3    began to yell. (*Id.* at 89; Pet. Ex. 20 (Tr. 141-43)). Hitting the
4    petitioner, Maria Perez asked what was going on. (Pet. Ex. 20 (Tr.
5    144-45)). Neither the petitioner nor R.B. responded. (*Id.* at 145).
6    R.B. quickly pulled up her pants and the petitioner stepped back.
7    (Pet. Ex. 19 (Tr. 92); Pet. Ex. 20 (Tr. 142-43)). Maria Perez
8    grabbed and opened her cell phone, and the petitioner knocked it
9    out of her hands. (Pet. Ex. 19 (Tr. 93)). Yelling, screaming, and
10   crying, Maria Perez asked R.B. what happened. When R.B. did not
11   answer, Maria Perez began to slap her. (*Id.* at 93-94)). As the
12   petitioner pulled Maria Perez off R.B., hotel security knocked at
13   the door. (*Id.* at 94-95).

14       The two hotel security officers who responded to the room
15   heard arguing and things being thrown around as they approached.
16   (Pet. Ex. 22 (Tr. 31-33)). After they knocked, the petitioner
17   opened the door and said, "I didn't do anything." (*Id.* at 33). The
18   petitioner then went down the hallway with one officer while R.B.
19   and Maria Perez went with the other officer. (*Id.* at 34). Maria
20   Perez, who was crying, shaking and very upset, told the officer
21   that when she had opened the door she saw R.B.'s pants and panties
22   down to her upper thigh, which she indicated by pointing to her
23   upper thigh. (*Id.* at 35-36). Maria Perez said she wanted to press
24   charges, so the officer took her to another location to fill out
25   voluntary statements. (*Id.* at 36-37). The officer wrote down what
26   Maria Perez said verbatim and read it back to her before Maria
27   Perez signed it. (*Id.* at 38-39).

28

4

When the police arrived, Maria Perez reported that she saw the petitioner grabbing R.B.'s chest and kissing R.B. and that R.B.'s pants were down around her ankles. (Pet. Ex. 22 (Tr. 65)). She also stated that she had tried to call the police but the petitioner had snatched her cell phone out of her hands. (*Id.* at 110-11). Maria Perez stated that she had become suspicious of the petitioner's relationship with R.B. earlier in the day. (Pet. Ex. 20 (Tr. 163-64)).

At trial, however, Maria Perez denied both that R.B.'s pants were down and that she told hotel security or the police as much. (Pet. Ex. 20 (Tr. 144, 151, 160); Pet. Ex. 22 (Tr. 17-20)). She testified that R.B. and the petitioner were not lying down, that the petitioner was not on top of R.B., and that they were not kissing; she testified she saw no part of the petitioner in or near R.B.'s vagina. (Pet. Ex. 22 (Tr. 17-20)). She also denied that the petitioner had prevented her from calling the police. (Pet. Ex. 20 (Tr. 148)). Maria Perez testified that R.B. claimed the petitioner forced her only after she threatened to tell R.B.'s mother what had happened. (Pet. Ex. 22 (Tr. 28)).

The petitioner told police that he kissed R.B. on the neck, that he had romantic feelings toward her, and that R.B. was a woman. (Pet. Ex. 22 (Tr. 126-27)). He admitted to telling her he was falling in love with her before their trip. (*Id.* at 130-31). He denied having sex with R.B. (*Id.* at 131).

R.B. told security that the petitioner had pinned her down on the bed and touched her and that she tried to push him off. (Pet. Ex. 19 (Tr. 97-98, 141-42)). She told police that she could feel the petitioner's erect penis and that she had been wearing a robe.

1   (*Id.* at 90-91, 173-75). At trial, she testified that none of this
2   was true. (*Id.* at 90-91, 97-98, 143, 173-75). R.B. testified that
3   she lied because she was afraid that if she told the truth, Maria
4   Perez would leave her alone in Vegas. (*Id.* at 97-98, 151). For the
5   same reason, she did not tell police that the petitioner put his
6   finger and tongue in her vagina. (*Id.* at 148-49). When asked if
7   she remembered this first report and whether all of it was true,
8   R.B. said, "Most of it was true and most of it was a lie." (*Id.* at
9   150).

10      A week after the Las Vegas incident, R.B. decided to tell her
11   family the truth. (Pet. Ex. 19 (Tr. 144)). She explained to them
12   that she and the petitioner had been kissing and were together.
13   (*Id.* at 100-01).

14      R.B. testified that she had known the petitioner her entire
15   life. (Pet. Ex. 19 (Tr. 49)). The summer before the incident, their
16   relationship began to change and the petitioner started calling
17   and texting her and acting romantically toward her. (*Id.* at 50-
18   54, 128-31). In June 2008, the petitioner winked at R.B. during a
19   family gathering. (*Id.* at 122-23). At another gathering, he grabbed
20   and rubbed R.B.'s feet. (*Id.* at 124, 127). The petitioner told
21   R.B. that he had feelings for her, and that he was uncomfortable
22   when she was around other boys; he also described to her dreams of
23   a sexual nature he had about her. (*Id.* at 54, 64-66). One day,
24   when R.B. and the petitioner were alone in a car, he touched her
25   thigh and hand and then they began kissing. (*Id.* at 63-64).

26      During trial, Dr. Paglini was called and asked whether, in
27   the situation of "a 13-year-old niece who had known her 33-year-
28   old uncle for her whole life and seen him on a regular basis," the

following hypotheticals occurring "over about a three or four month period," constituted grooming, (Pet. Ex. 20 (Tr. 54-62)): the perpetrator (1) "touching the nieces [sic] foot under the table at family parties, maybe winking at the niece", (*id.* at 54); (2) making "phone calls . . . to the individual who is being groomed" telling her how pretty she was, (*id.* at 57-58); (3) making "comments … that … the … alleged perpetrator thought that this child was someone he could trust," (*id.* at 58); (4) spending more time with the niece over the three-month period, with touching and winking, (*id.* at 59); (5) trying to get the 13-year-old alone with him, (*id.* at 59); (6) while alone, holding his niece's hand, touching her thigh, and French kissing her, (*id.* at 59); (7) making statements to his niece that he was concerned about her spending time with other boys, (*id.* at 60); (8) telling the niece about a dream he had about taking her clothes off, (*id.* at 60); (9) sitting at a table with his wife and touching the niece's foot under the table, (*id.* at 61); (10) while out walking with his wife and niece, with his wife in front, grabbing his niece and putting his arm around her, (*id.* at 61-62); (11) touching the niece under water while swimming, (*id.* at 62); and (12) inviting the niece on an out-of-town trip to attend a concert, (*id.* at 62). Dr. Paglini responded that all of it was potential grooming. (*Id.* at 58-60, 62).

Additionally, the State introduced a phone call between the petitioner and his wife that was recorded while the petitioner was incarcerated. (Pet. Ex. 21). As defense counsel refused to stipulate to foundation, the State first called a witness from the prison to authenticate the phone call.

Ultimately, the jury found the petitioner guilty on all but one count. (Pet. Ex. 25). The petitioner was then sentenced to several concurrent terms of imprisonment, including two terms of life with the possibility of parole after thirty-five years. (Pet. Ex. 33).

The petitioner pursued a direct appeal and a state postconviction petition and appeal. Failing to obtain relief in state court, the petitioner filed the instant federal habeas petition.

**II. Standard**

28 U.S.C. § 2254(d) provides the legal standards for this Court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with

1   [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86,

2   102 (2011). The Supreme Court has emphasized "that even a strong

3   case for relief does not mean the state court's contrary conclusion

4   was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75

5   (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

6   (describing the AEDPA standard as "a difficult to meet and highly

7   deferential standard for evaluating state-court rulings, which

8   demands that state-court decisions be given the benefit of the

9   doubt") (internal quotation marks and citations omitted.)

10      A state court decision is contrary to clearly established

11  Supreme Court precedent, within the meaning of 28 U.S.C. § 2254,

12  "if the state court applies a rule that contradicts the governing

13  law set forth in [the Supreme Court's] cases" or "if the state

14  court confronts a set of facts that are materially

15  indistinguishable from a decision of [the Supreme Court] and

16  nevertheless arrives at a result different from [the Supreme

17  Court's] precedent." *Andrade*, 538 U.S. 63 (quoting *Williams v.*

18  *Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at

19  694).

20      A state court decision is an unreasonable application of

21  clearly established Supreme Court precedent, within the meaning of

22  28 U.S.C. § 2254(d), "if the state court identifies the correct

23  governing legal principle from [the Supreme Court's] decisions but

24  unreasonably applies that principle to the facts of the prisoner's

25  case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413).

26  The "unreasonable application" clause requires the state court

27  decision to be more than incorrect or erroneous; the state court's

28

application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181. The state courts' decisions on the merits are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, - U.S. -, 135 S. Ct. 2187, 2208 (2015).

The petitioner claims in this action each assert ineffective assistance of counsel. Such claims are governed by *Strickland v.*

*Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief—deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Strickland*, 466 U.S. at 696.

**III. Analysis**

    A. Ground One

    In his first ground for relief, the petitioner asserts that counsel on direct appeal was ineffective for failing to adequately brief, and omitting meritorious arguments in support of, his claim that his right to a fair trial was violated by Dr. Paglini's inappropriate and unnoticed expert testimony. (ECF No. 17 at 8).

    On direct appeal, counsel raised a single issue: that Dr. Paglini's testimony was erroneously admitted. (Pet. Ex. 37). In the brief, counsel argued that the notice was insufficient and Dr. Paglini was not qualified to testify on grooming. (*Id.*)

    The Nevada Supreme Court affirmed. In a 4-3 decision, the Supreme Court rejected the petitioner's argument that the notice was insufficient, explaining that it was filed more than a month

before trial, identified that Dr. Paglini would testify as to grooming, and included Dr. Paglini's curriculum vitae demonstrating experience relevant to his expertise. (Ex. 43 at 17-18).[3] The court continued:

> Perez's brief argument does not allege that the State acted in bad faith or that his substantial rights were prejudiced because the notice did not include a report or more detail about the substance of Dr. Paglini's testimony. . . . Under the circumstances, we discern no abuse of discretion in allowing Dr. Paglini to testify.

(*Id.* at 18). The court also concluded that (1) Dr. Paglini was qualified to testify, (2) the testimony was relevant and, with one exception, limited to Dr. Paglini's area of expertise, and (3) Dr. Paglini did not improperly vouch for the victim. (Pet. Ex. 43 at 6-17). In part of its analysis, the court explained:

> As to unfair prejudice, Dr. Paglini's testimony did not stray beyond the bounds set by this court and other jurisdictions for expert testimony. Dr. Paglini generally addressed how grooming occurs and its purpose. He then offered insight in the form of hypotheticals that were based on Perez's conduct and indicated that such conduct was probably grooming behavior. *See Shannon v. State*, 105 Nev. 782, 787, 783 P.2d 942, 945 (1989) (providing that experts can testify to hypotheticals about victims of sexual abuse and individuals with pedophilic disorder). He did not offer an opinion as to the victim's credibility or express a belief that she had been abused. *See Townsend*, 103 Nev. at 118-19, 734 P.2d at 708-09. Dr. Paglini's testimony therefore meets the first component of the "assistance" requirement.

(*Id.* at 13).

In state postconviction proceedings, the petitioner argued that appellate counsel was ineffective for failing to argue that the State's insufficient notice was in bad faith, that Dr. Paglini's testimony failed to help the jury understand the evidence

---

[3] Citation is to ECF page number at the top of the page.

or determine an issue, and that the testimony caused him prejudice.

(Pet. Ex. 54 at 41-42, 49-50).[4] The Nevada Supreme Court held:

> [A]ppellant contends that his appellate counsel was ineffective by failing to argue on direct appeal that an expert's testimony failed to assist the jury in understanding the evidence or determining an issue and that appellant was prejudiced by the testimony. Because this court nonetheless addressed these subjective issues and specifically concluded that the expert's testimony assisted the jury and did not prejudice appellant, . . . there was no reasonable probability of a different outcome on appeal had counsel made these arguments. *Kirksey v. State*, 112 Nev. 980, 998, 923 P.2d 1102, 1113 (1996) ("To establish prejudice based on the deficient assistance of appellate counsel, the defendant must show that the omitted issue would have a reasonable probability of success on appeal."). The district court therefore properly rejected this claim. . . .
>
> Lastly, appellant argues that his appellate counsel should have asserted that the State acted in bad faith in providing an inadequate notice of the expert's testimony. Appellant has not demonstrated prejudice, however, because this court concluded in *Perez*, 129 Nev., at 862-63, 313 P.3d at 870, that the expert witness notice was sufficient, and thus, any argument concerning the State's bad faith in providing an insufficient notice would not have altered the outcome. Further, appellate counsel challenged the adequacy of the expert witness notice and appellant has not pointed to anything that demonstrates the State's bad faith or that he was prejudiced by the expert notice. [n.3: The dissent concludes that appellate counsel's failure to allege that the State acted in bad faith in providing its expert witness notice warranted an evidentiary hearing because appellant was surprised by the expert's testimony and did not know that the expert would be presented with hypotheticals involving facts similar to the underlying facts here. During a pretrial hearing, however, the State specifically informed appellant that the expert would testify regarding grooming techniques and then be asked to apply his knowledge of those techniques to the facts of this case.] Thus, the district court did not err in rejecting appellant's claim of ineffective assistance of appellate counsel.

(Pet. Ex. 57 at 2-4).

The petitioner asserts that Dr. Paglini's testimony was highly prejudicial because it employed hypotheticals directly

---

[4] Citation is to original page of document.

13

mirroring the facts of the case, which suggested that the petitioner had groomed R.B. and was akin to profile evidence, which is generally inadmissible. In addition, he argues, the testimony had the effect of rationalizing R.B.'s inconsistent testimony.[5] He argues that the case against him was weak, as evidenced by R.B. and Maria Perez's inconsistent and conflicting statements. The petitioner argues that given the highly prejudicial nature of Dr. Paglini's testimony and the weak evidence supporting his guilt, it is reasonably likely that at least one justice on direct appeal would have voted to reverse his conviction if counsel had appropriately briefed the appeal.

The state courts were not objectively unreasonable in concluding that the petitioner had not shown a reasonable likelihood of a different result if his counsel had made these arguments. The majority justices concluded on postconviction review that they would not have decided the appeal any differently even if counsel had briefed the appeal as the petitioner asserts he should have – either because they actually decided the issues or because the petitioner's claims were unsupported. This was a reasonable conclusion. Many of the arguments the petitioner asserts should have been raised were in fact raised in the amicus brief and/or addressed directly by the court in its majority opinion. While bad faith was not argued or decided by the court on direct appeal, the postconviction court held that there was no evidence of bad faith and that the petitioner was not surprised by

---

[5] The petitioner additionally makes several arguments for the first time in his reply. The court will not consider contentions raised for the first time in the reply. See *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

Dr. Paglini's testimony. These conclusions were not objectively unreasonable. Thus whatever the deficiencies of counsel's briefing, it is not reasonably likely that a better brief would have changed the result.

In sum, the state courts' conclusion that the petitioner suffered no prejudice from the alleged deficient performance of counsel is not contrary to, or an unreasonable application of, clearly established federal law, nor is it an unreasonable determination of the facts. Accordingly, the petitioner is not entitled to relief on Ground One.

B. Ground Two

In his second ground for relief, the petitioner asserts that trial counsel was ineffective for (1) "irrationally failing to stipulate to the foundation of" a jail call made by the petitioner; and (2) allowing an attorney to participate in the trial despite having his license suspended for mental health reasons. (ECF No. 17 at 17).

i. Jail Call

Before trial began, the State advised the court that it would be introducing the transcript of a phone call between the petitioner and his wife, recorded while the petitioner was incarcerated, and that it would need to call a witness from the jail to authenticate the call because the defense was refusing to stipulate to foundation. Defense counsel responded to this by stating he was "not stipulating to anything." (*See* Ex. 17 (Tr. 17-18)). Defense counsel explained that he had several objections to the phone call coming in but that he would continue to refuse to

stipulate even if the court otherwise deemed the call admissible. (*Id.* at 18-22).

Later, defense counsel stated that he was not stipulating to foundation because he was certain the jury would know or at least suspect the calls were recorded while the defendant was in jail. (See Ex. 19 (Tr. 181-83)). The court told counsel that the recording was probably going to come in and to focus on whether he wanted any prejudicial statements redacted therefrom. (*Id.* at 183-86).

The next day, the court ruled that the call was coming in and told defense counsel to decide whether to stipulate to foundation. (Ex. 20 (Tr. 10)). Defense counsel replied, "I can't help them with their case, Judge." (*Id.*) The court responded, "Actually, I think it's helping your client." (*Id.* at 10-11). The court then asked the petitioner whether he was "on board with that decision." (*Id.* at 11). After counsel and the petitioner spoke, the petitioner invoked the Fifth Amendment. (*Id.*) The court advised that its question did not implicate the Fifth Amendment and that she just wanted to make sure the petitioner was on board because she believed that counsel's refusal to stipulate would be prejudicial to the defense. (*Id.* at 11-12). Then, for the next forty-five minutes, the court went back and forth with the petitioner and counsel about whether the petitioner could refuse to answer the question. (*Id.* at 12-39). At some point, defense counsel stated that he did not think the State could get the call in without causing reversible error. (*Id.* at 29). Eventually the court ceased the discussion, concluding that she would assume that the petitioner agreed with his counsel's strategy. (*Id.* at 39).

16

1    During the testimony of the jail witness that followed,

2  defense counsel immediately moved for a mistrial on the grounds

3  that the jury now knew his client was incarcerated. (Ex. 20 (Tr.

4  90-92)).

5    In his state postconviction petition, the petitioner argued

6  that trial counsel was ineffective for failing to stipulate to the

7  foundation for the call, thus assuring that the jury would hear

8  from a State witness that the petitioner was incarcerated. The

9  Nevada Supreme Court addressed the petitioner's claim as follows:

> [C]ounsel's decision not to stipulate to the foundation
> for a jail phone call did not establish deficient
> representation as the decision was merely a trial
> strategy and appellant was given the opportunity to
> contest that trial strategy, but chose not to do so. *See
> Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280-
> 81 (1996) (providing that a strategy decision "is a
> tactical decision that is virtually unchallengeable
> absent extraordinary circumstances" (internal
> quotations omitted)). [Thus], … appellant failed to
> establish a deficiency in his trial counsel's
> representation. . . ."

17  (Pet. Ex. 57 at 3).

18    There is sufficient evidence in the record made during the

19  trial court proceedings to support the Nevada Supreme Court's

20  conclusion that counsel's refusal to stipulate to the foundation

21  for the call was strategic. Counsel stated that he was not going

22  to help the State put on its case, and that he believed

23  introduction of the petitioner's incarceration status would be

24  grounds for reversal. Counsel further suggested he believed the

25  jury would surmise the call had been recorded while the petitioner

26  was in jail. The court cannot conclude that the Nevada Supreme

27  Court was objectively unreasonable in concluding that counsel's

28  refusal to stipulate to foundation was a strategic decision within

1  the wide bounds of reasonable representation.[6] Accordingly, the

2  petitioner is not entitled to relief on Ground Two(A).

3              ii. Suspended Attorney

4      In Ground Two(B), the petitioner asserts that trial counsel

5  was ineffective for allowing John Rogers to participate in his

6  representation despite the fact that Rogers' license had been

7  suspended for mental health issues. (ECF No. 17 at 17). The

8  petitioner argues that Rogers "participated in bench conferences,

9  sat at the defense table, addressed the court, and even appeared

10  as counsel in the court documents and transcripts." (*Id.* at 22).

11  The Nevada Supreme Court addressed this claim as follows:

> 12      [A]ppellant failed to include specific factual
>    allegations that demonstrated that without the
> 13    unlicensed attorney's participation in the trial, he
>    would have received a more favorable outcome. Thus, he
> 14    failed to establish that the unlicensed attorney's
>    participation was deficient assistance of counsel by
> 15    either the unlicensed attorney or his trial counsel.

16  (Pet. Ex. 57 at 3).

17      The petitioner concedes it is unknown the extent to which

18  Rogers participated but asserts that where there is *de facto*

19  absence of counsel, prejudice can be presumed. The respondents

20  assert that the record suggests that Rogers primarily sat behind

21  the counsel table and took notes and that it was the petitioner's

22  counsel who did everything during trial. In reply, the petitioner

23  argues that he was never given the opportunity to develop his claim

24  of prejudice on this claim and that the court should therefore

25  conduct an evidentiary hearing.

26

27  [6] The court therefore need not, and does not, address respondents'
    alternative contention that the petitioner was not prejudiced by
28  counsel's conduct.

First, the petitioner has provided no legal or factual support for his assertion that Rogers' participation in his defense resulted in a *de facto* deprivation of counsel. The petitioner was represented by licensed counsel. Further, Rogers' license was suspended and not revoked. Under these circumstances, there is no support for the finding that the petitioner suffered *de facto* deprivation of counsel. *See United States v. Hoffman*, 733 F.2d 596, 599-601 (9th Cir. 1984).

Second, the petitioner has not established a reasonable likelihood of a different outcome had Rogers not participated in his trial. There is no evidence or specific factual allegation of how Rogers influenced any events during the trial, much less a compelling argument that the result of trial would have been different had those events not occurred. The state courts were not therefore objectively unreasonable in rejecting this claim.

Indeed, the petitioner concedes that his claim is unsupported but argues that he is entitled to an evidentiary hearing to develop the factual basis of his claim. For the reasons discussed *infra*, the petitioner is not entitled to an evidentiary hearing on this claim.

Accordingly, the petitioner is not entitled to relief on Ground Two(B).

**IV. Request for Evidentiary Hearing**

Although the petition contains a request for an evidentiary hearing, there is no argument provided in support of that request in the petition nor is there a separately filed motion for an evidentiary hearing. While the reply contains argument in support

1  of the request, the court will not consider arguments raised for
2  the first time in the reply. *Zamani*, 491 F.3d at 997.

3       Further, even if the court were to consider the petitioner's
4  arguments, the request for a hearing would be denied, as the
5  petitioner has made no "colorable allegations that, if proved at
6  an evidentiary hearing, would entitle him to habeas relief."
7  *Williams v. Filson*, 908 F.3d 546, 564-65 (9th Cir. 2018).

8  **V. Certificate of Appealability**

9       In order to proceed with an appeal, the petitioner must
10  receive a certificate of appealability. 28 U.S.C. § 2253(c)(1);
11  Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d
12  946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*,
13  236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must
14  make "a substantial showing of the denial of a constitutional
15  right" to warrant a certificate of appealability. *Allen*, 435 F.3d
16  at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473,
17  483-84 (2000). "The petitioner must demonstrate that reasonable
18  jurists would find the district court's assessment of the
19  constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951
20  (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold
21  inquiry, the petitioner has the burden of demonstrating that the
22  issues are debatable among jurists of reason; that a court could
23  resolve the issues differently; or that the questions are adequate
24  to deserve encouragement to proceed further. *Id.*

25       The court has considered the issues raised by the petitioner,
26  with respect to whether they satisfy the standard for issuance of
27  a certificate of appealability and determines that none meet that

28

1    standard. Accordingly, the petitioner will be denied a certificate

2    of appealability.

3    **VI. Conclusion**

4         In accordance with the foregoing, IT IS THEREFORE ORDERED

5    that the first amended petition for writ of habeas corpus (ECF No.

6    17) is hereby DENIED.

7         IT IS FURTHER ORDERED that the petitioner is DENIED a

8    certificate of appealability.

9         The Clerk of Court shall enter final judgment accordingly and

10   CLOSE this case.

11        IT IS SO ORDERED.

12        DATED: This 14th day of September, 2020.

13

14   _____

15   UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28